J-S87021-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| R.W.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| S.M.F. | |
| Appellant | No. 1116 MDA 2016 |

Appeal from the Order Entered June 23, 2016
In the Court of Common Pleas of Lancaster County
Civil Division at No(s): CI-13-03345

BEFORE:  LAZARUS, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.:          **FILED DECEMBER 22, 2016**

S.M.F. ("Mother") appeals from the June 23, 2016, custody order as to the parties' children, K.J.M. and B.W.M. (collectively, "the Children").  Upon careful review, we affirm.

**Factual and Procedural History**

K.J.M. was born in September 2009; B.W.M. was born in April 2011.  K.J.M. is currently in first grade, and B.W.M. attends kindergarten.  N.T., 5/23/16, at 104; Trial Court Opinion, filed Aug. 11, 2016, at 23 n.2.

R.W.M. ("Father") and Mother (collectively, "the Parents") separated in 2012.  N.T., 5/23/16, at 46, 53, 92; N.T., 6/8/16, at 222.  Mother has been the primary physical custodian of the Children since that time.

---

[*] Retired Senior Judge assigned to the Superior Court.

Mother and the Children live in Manheim, Lancaster County with Mother's current husband ("Husband"). Mother is 28 years old, and the Children are her only children. N.T., 5/23/16, at 89-90; Trial Ct. Op. at 4. Mother has a high school diploma but no higher education; she had not worked during the three years preceding the 2016 custody hearing but had previously been employed repairing vacuum cleaners. Mother met Husband in late 2012 and married him on May 28, 2016. N.T., 6/8/16, at 222. Husband has completed one year of college. N.T., 5/23/16, at 46-48. Until the summer of 2016, he was employed by Sunoco LP for approximately three years in its office in Reading, Berks County, where he worked in information technology, earning $63,000.00 per year.

After he separated from Mother, Father moved to Reading. N.T., 5/23/16, at 5-6, 64, 92-93, 124, 136-37. Father now lives in Sinking Spring, Berks County and works in a candy factory in Lancaster. Father lives with a roommate ("Roommate") and with his current girlfriend ("Girlfriend"). When K.J.M. was born, Father, Mother, and Roommate lived together, and the Children call Roommate their "Uncle." *Id.* at 134-36, 144; N.T., 6/8/16, at 195. Father's Girlfriend has three children of her own, and custody of her youngest child is shared between Girlfriend and that child's father. N.T., 6/8/16, at 196-97; Trial Ct. Op. at 12-13.

"Father pays approximately $500.00 per month in child support. Father consistently meets his child support obligation." Trial Ct. Op. at 5

(citing N.T., 5/23/16, at 21-22). The salary of Mother's Husband is the only income in Mother's household other than child support; if she needs money for something personal, she has to ask Husband for it. Trial Ct. Op. at 6. Expenditures in Mother's household for the Children come out of Father's child support obligation; if the child support obligation is insufficient, Mother asks Husband for money, which he gives to her only "[w]hen it is financially viable." N.T., 5/23/16, at 57. Mother had to withdraw K.J.M. from a scouting organization because she could not afford the expenses associated with the organization. Trial Ct. Op. at 7.

Mother's Husband has claimed the Children as dependents on his income tax returns for the past three years. N.T., 5/23/16, at 170. He testified that the income tax refund he received was sufficient to allow him to pay $3,000.00 towards his wedding with Mother in 2016. *Id.* at 58. Mother testified that she did not know that Husband listed the Children as dependents on his income tax returns. *Id.* at 109.

There is no dispute that both of the Parents are capable of attending to the daily physical, emotional, developmental, and educational needs of the Children. Trial Court Order, dated June 23, 2016, at 11. Similarly, there are no concerns about the mental or physical condition of either party or of any member of either party's household. *Id.* at 13.

According to Mother, on two occasions she called the Lancaster County Children and Youth Social Service Agency ("the Agency") to complain about

Father's care of the Children when they were in his custody. However, when asked during cross-examination whether the Children had been neglected by Father, Mother stated only that B.W.M. once had a dirty diaper when he was returned from Father's care and "it was caked on." N.T., 5/23/16, at 126. She was "not sure if you would call that neglect." *Id.* Both of Mother's referrals to the Agency resulted in no action taken against Father. *Id.*

Father presented evidence that Mother may be undermining his relationship with the Children by having them call him by his first name. On May 28, 2014, as Father was picking up the Children at a physical custody exchange, Mother referred to Father by his first name when addressing B.W.M. N.T., 5/23/16, at 32-33. When Father returned the Children, he heard their maternal grandmother, C.A.F. ("Maternal Grandmother"), also refer to Father by his first name when addressing the Children. *Id.* at 33. Maternal Grandmother then told the Children that Father "is your other daddy," and the Children responded, "[Y]eah, I know." *Id.* Since then, the younger child, B.W.M., has sometimes been referring to Father by his first name. *Id.* at 33, 81, 97-98, 141-42. Father would later relate that "[i]t comes out so naturally, as if [B.W.M.] hears it all the time." *Id.* at 33. Father fears that B.W.M. does not know who that child's father is, or that the child is being told otherwise. *Id.* During Father's most recent visit with the Children, B.W.M. referred to Father by his first name five times within the first two hours and eleven times overall. *Id.* There is contradictory

evidence as to whether the older child, K.J.M., also refers to Father by his first name. *Id.* at 97, 145-46.

Additionally, Father presented evidence relating to Mother's failure to transport the Children to a court-ordered location for exchanging the Children for Father's regularly scheduled periods of partial custody. In June 2015, Mother advised Father that she was having "car problems" and that "it was going to be a little while until she was able to get her car fixed." N.T., 5/23/16, at 9. Father therefore agreed to receive the Children close to Mother's residence, eliminating Mother's responsibility for transportation. *Id.* at 9-10. As the trial court later stated:

> [I]n any given period of two weeks, Father covered the extra distance ten times and spent approximately three hours and twenty minutes more time in his vehicle than would have been the case if Mother had abided by the Order by bringing the Children to the designated physical custody exchange location.

Trial Ct. Op. at 25. Mother never offered to compensate Father for his time and expenses associated with this additional travel. *Id.* at 26.

On July 29, 2015, a custody conciliation conference was held pursuant to a custody complaint for modification filed by Mother; the conference resulted in a recommended order that was entered on September 30, 2015. Trial Ct. Op. at 1. The Parents agreed by stipulation that the recommended order be made a final order, and the trial court complied on October 19, 2015. *Id.* at 2. Pursuant to this order, the Parents shared legal custody of the Children, Mother continued to have primary physical custody of the

Children, and physical custody exchanges were to occur at Oregon Dairy in Lititz, Lancaster County, which was a halfway point between the Parents' residences. Trial Court Order, dated Sept. 30, 2015, at 1-2, 4; N.T., 5/23/16, at 10.[1]

From November 19, 2015, to December 12, 2015, Father provided all of the transportation for the Children, because Mother's car had become inoperable. Trial Ct. Op. at 18 (citing N.T., 5/23/16, at 12-13). On New Year's Eve 2015, Maternal Grandmother transported the Children to the custody exchange. *Id.* at 19 (citing N.T., 5/23/16, at 16).

When Mother continued not to be able to meet at the court-ordered location, N.T., 5/23/16, at 37, Father became frustrated and stopped seeing the Children. The trial court later concluded that, for at least five months prior to the relocation order at issue, Father had only seen the Children once, on Easter Sunday 2016. N.T., 5/23/16, at 16; Trial Ct. Order, 6/23/16, at 3; Trial Ct. Op. at 19. For this Easter meeting, Father provided all of the transportation and picked up and returned the Children close to Mother's residence.

On February 17, 2016, Father filed a petition for contempt against Mother, alleging that, from early July 2015 until October 10, 2015, and again from December 31, 2015, until the date of the petition, Mother

---

[1] The Trial Ct. Order, 6/23/16, at 2, stated that the Parents' residences "are approximately 35 miles apart."

consistently failed to transport the Children to the agreed-upon and court-ordered physical custody exchange location, Oregon Dairy. Pet. for Contempt, 2/17/16, at 2-4; Trial Ct. Order, 6/23/16, at 2.[2] Mother had done nothing to rectify her transportation issues and had told Father that he had to drive to Manheim or would not see the Children. N.T., 5/23/16, at 37.

In 2016, Mother's Husband was informed that his job would move to Dallas, Texas. As the trial court recited:

> Husband's employer will be closing its Reading office and has offered him the same position he currently holds but in its office in Dallas, Texas.
>
> Husband was formally advised by his employer of the Pennsylvania office closure and his possible transfer to Dallas in February 201[6].
>
> Husband's employer has paid for his college as a benefit of employment and has advanced some costs associated with Husband's removal to Dallas. As of the date of the hearing, these sums amounted to $8,000.00.
>
> If Husband does not transfer to his employer's Dallas office, he will owe his employer the approximate amount of $8,000.00.

Trial Ct. Op. at 7 (citing N.T., 5/23/16, at 49, 52, 70). Husband discussed the job relocation with Mother and with his family – but not with Father – and decided to accept the transfer. He notified Sunoco and was told to

---

[2] The petition for contempt specified that Maternal Grandmother transported the Children to Oregon Dairy on December 31, 2015; the last day that Mother transported the Children herself was December 12, 2015. Pet. for Contempt at 2.

report to the Dallas office by August 1, 2016. N.T., 5/23/16, at 50-52. Husband is not from Dallas, has no ties there, and testified that he would refuse to pay for the Children to fly from Texas to Pennsylvania to see Father if the Children were allowed to relocate to Dallas. *Id.* at 51, 63-65.

On March 22, 2016, Father filed a "Counter-Affidavit Regarding Relocation." There is nothing in the record about relocation prior to this filing. In the Counter-Affidavit, Father states that he "object[s] to the relocation" and "object[s] to the modification of the custody order." By order dated March 28, 2016, a hearing was scheduled for May 23, 2016. The trial court explained:

> On April 14, 2016, Mother filed a Petition for Modification of Custody Order, which included Mother's Relocation Notice Pursuant to 23 Pa.C.S.A. 5337(c) addressing Mother's proposed relocation to Dallas, Texas.
>
> On April 18, 2016, Father filed a Second Petition for Contempt against Mother. Father's Second Petition for Contempt accused Mother of permitting her then fiancé (who is now her husband) to be identified by the [C]hildren as their father.
>
> Mother's Petition for Modification of Custody Order and Father's Second Petition for Contempt were consolidated to be heard on the same date and time as Father's first Petition for Contempt and Counter-Affidavit Regarding Relocation.

Trial Ct. Op. at 2-3.

Around this time, Mother borrowed Husband's automobile to take the Children to a doctor's appointment. Mother was involved in a traffic collision, and Husband's car was "totaled" for insurance purposes. N.T., 5/23/16, at 57. Husband then bought a new vehicle for himself. *Id.*

- 8 -

During the hearing on May 23, 2016, Mother testified that she wanted to relocate to Dallas because she believed that the Children will be in a better financial situation if the relocation were granted. N.T., 5/23/16, at 91. Mother did not anticipate any enhancement to her or to the Children's quality of life if they were permitted to move, however, and she did not plan to work after she moved to Dallas. *Id.* at 61, 63, 101. If the relocation were to be granted, Mother recognized that she would need to pay for transportation for the Children to see Father – she "guess[ed]" she "would have to figure out some sort of way." *Id.* at 116. Mother believed that Father should share in the cost burden of transporting the Children. Nevertheless, Mother had asked Father to agree to the relocation, in exchange for which she would reduce Father's child support obligation and would pay for the transportation of the Children to Pennsylvania. *Id.* at 116-17.

Husband testified that, since he does not have a college degree, the only places where he could find employment similar to his current position would be in California, Colorado, Texas, or Utah. N.T., 5/23/16, at 50. Husband emphasized that moving to Dallas is a better option than staying in Manheim and taking an annual pay cut of $20,000 to $30,000. *Id.* at 53. Husband opined that Father should pay for any costs associated with the Children having to fly back and forth between Texas and Pennsylvania. *Id.* at 63-65. Husband added that he felt that Father should have already been

paying for transportation costs in full while they have been living in Pennsylvania. *Id.* at 64. Husband stressed that he paid for repairs for Mother's vehicle, which ultimately stopped working; Husband considered the money for these repairs to be a contribution towards transportation costs. *Id.* at 57.

Husband admitted that "it is very important" for the Children to maintain the relationship with Father. N.T., 5/23/16, at 66. Nevertheless, when asked how that relationship was going to be possible if the Children are relocated to Dallas, Husband answered: "I don't feel at this point it is any different than him moving to Reading for no reason other than to live with his friend. I don't feel it is any different in concept." *Id.*

Father testified that, "[i]n the event that Mother's relocation request is denied and Father is awarded primary physical custody of the Children, Father would be able to care for the Children with the assistance of his Roommate, his [Girlfriend], and a day care provider." Trial Ct. Op. at 14 (citing N.T., 5/23/16, at 161-64). Father added that if he is granted primary physical custody, he would break his present lease if necessary to accommodate the Children in a larger residence. *Id.* at 15 (citing N.T., 5/23/16, at 165, 168).

A second hearing was held on June 8, 2016, about a week after Mother married Husband. During this hearing, the parties stipulated to Mother and Husband's marriage, and Girlfriend testified, providing some biographical

information and reinforcing Father's and Roommate's testimony about their living arrangement. N.T., 6/8/16, at 195-99, 222.

On June 23, 2016, the trial court issued an order: (1) denying Mother's relocation request; (2) ordering that, if Mother moved to Dallas, then primary physical custody of the Children would transfer to Father; (3) holding Mother in willful contempt for failing to transport the Children to the designated custody exchange location; and (4) awarding Father $1,680.00 in counsel fees to be paid by Mother as a sanction for her contempt. Trial Ct. Order, 6/23/16, at 7, 16, 18-20.[3] In a later opinion, the trial court explained that it had denied Mother's relocation decision because Mother had failed to establish that the proposed relocation to Dallas would serve the best interests of the Children as required by 23 Pa.C.S. § 5337(i)(1) and the factors set forth in Section 5337(h). Trial Ct. Op. at 21.

On July 16, 2016, Mother filed this timely appeal.

**Issues**

Mother raises the following issues for our review:

1.     WHETHER THE LOWER COURT PROPERLY ANALYZED AND APPLIED THE CUSTODY RELOCATION FACTORS FOUND IN 23 Pa.C.S. 5337(h).

2.     WHETHER THE LOWER COURT'S DENIAL OF MOTHER'S RELOCATION REQUEST [(A)] WAS AN ABUSE OF DISCRETION, [(B)] WAS BASED ON FINDINGS THAT CANNOT BE SUSTAINED

_____

[3] The order did not specify the statute or Rule of Civil Procedure upon which the contempt sanction was based. Trial Ct. Order, 6/23/16, at 19.

UNDER THE EVIDENCE SUBMITTED AT TRIAL, [(C)] WAS UNREASONABLE IN LIGHT OF THE FACTS SUBMITTED AT TRIAL AND [(D)] WAS NOT IN THE BEST INTEREST OF THE CHILDREN.

3.    WHETHER THE LOWER COURT INCORRECTLY ANALYZED THE NATURE, QUALITY AND EXTENT OF THE INVOLVEMENT AND DURATION OF CHILDREN'S RELATIONSHIP WITH APPELLANT WHO WAS PROPOSING TO RELOCATE TO TEXAS, AS COMPARED TO THE NON-RELOCATING FATHER (APPELLEE), SIBLINGS AND SIGNIFICANT OTHER PERSONS IN CHILDREN'S LIVES.

4.    WHETHER THE LOWER COURT INCORRECTLY ANALYZED THE NATURE, QUALITY, EXTENT OF INVOLVEMENT, AND DURATION OF APPELLEE'S RELATIONSHIP WITH THE CHILDREN.

5.    WHETHER THE LOWER COURT COMMITTED AN ERROR OF LAW, AND ABUSED ITS DISCRETION IN THE AWARD OF COUNSEL FEES TO FATHER.

Mother's Brief at 7 (answers omitted).

### Custody

Mother's first four issues all relate to the trial court's application of the Custody Act's provisions relating to custody and relocation, and we therefore address all four issues together as part of a general review of the court's application of the Act.

We begin by acknowledging our scope and standard of review in custody cases:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings.

- 12 -

Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**D.K. v. S.P.K.**, 102 A.3d 467, 478 (Pa. Super. 2014).

When considering whether to grant relocation, the court must analyze the ten factors set forth in the relocation provision of the Custody Act, 23 Pa.C.S. § 5337:

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

- 13 -

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h); *see* Mother's Brief at 7 ¶ 1. The record clearly and unequivocally demonstrates that the trial court thoroughly and completely considered all ten of these factors, as set forth in its order dated June 23, 2016, and expanded upon its analysis of them in its opinion dated August 11, 2016.[4] Informed by that order and opinion, we review each factor briefly below.

_____

[4] The trial court also applied the general child custody factors stated in 23 Pa.C.S. § 5328(a). Trial Ct. Order, 6/23/16, at 8-13. Nevertheless, Mother makes no specific argument about the trial court's analysis of the Section 5328(a) factors. **See** Mother's Brief at 26-34. The only mention of Section 5328(a) in Mother's entire brief is as follows:

> The lower court did not commit an error of law, in that it did consider the child custody factors and the child custody

*(Footnote Continued Next Page)*

**(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.[5]** In analyzing this factor, the trial court noted that, although Mother has been the primary physical custodian of the Children since the Parents separated, N.T., 5/23/16, at 92, Father also has an established relationship with them. Trial Ct. Order, 6/23/16, at 2.

The trial court considered the parents' physical custody exchanges in connection with this factor. Under the court's order dated September 30, 2015, at 4, the Parents were to meet for physical custody exchanges at Oregon Dairy, a halfway point between their residences. N.T., 5/23/16, at 10. When Mother initially developed vehicle problems, *id.* at 9, Father would facilitate the exchange by driving to a location within walking distance of Mother's home in order to retrieve the Children. Trial Ct. Op. at 18 (citing N.T., 5/23/16, at 12-13). However, when Mother continued to not be able to meet at the court-ordered location, N.T., 5/23/16 at 37, Father became frustrated and stopped seeing the Children. The trial court concluded that,

*(Footnote Continued)* ——————————

relocation factors as set forth in 23 Pa.C.S. 5337(h) and 23 Pa.C.S. 5328(a). However, the lower court's findings, deductions and inferences were not supported by the evidence.

Mother's Brief at 13.

[5] This first relocation factor corresponds to the third and fourth issues raised by Mother for this Court's review on appeal. *See* Mother's Brief at 7 ¶¶ 3-4.

for at least five months prior to the relocation order, Father had only seen the Children once. Trial Ct. Order, 6/23/16, at 3; Trial Ct. Op. at 19. The trial court found Father's frustration to be understandable and faulted Mother for making no meaningful attempt to correct the situation. Trial Ct. Order, 6/23/16, at 3. The trial court held that the Children had been deprived of seeing Father, which was not in their best interest. *Id.* We must accept these findings of the trial court, as they are supported by competent evidence of record. *D.K.*, 102 A.3d at 478.

The trial court concluded that Father is more likely than Mother to encourage and permit frequent and continuing contact between the Children and the other parent and that "Mother chooses not to cooperate with Father." Trial Ct. Order, 6/23/16, at 12. Although the trial court did not explicitly state that this factor weighed in either party's favor, the implication of the court's finding that Mother was at fault for interfering with Father's visits with the Children was that this factor was in Father's favor. Although we are not bound by the trial court's deductions or inferences from its factual findings, we do not find the trial court's conclusions to be unreasonable in light of the evidence. *See D.K.*, 102 A.3d at 478.

**(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.** The trial court found that there was no

testimony offered about the "physical, educational and emotional development" of the Children, which Mother conceded. Trial Ct. Order, 6/23/16, at 3; Mother's Brief at 28. The trial court continued: "The only inference to be drawn is that the Children will continue to live with Mother and [Husband]." Trial Ct. Order, 6/23/16, at 3. The court added that "Mother does not work and does not plan on working in Dallas," *id.*; *see* N.T., 5/23/16, at 61, 63, 101; Trial Ct. Op. at 4, and "Mother's husband testified that he will give Mother money for her needs, but all expenses for the Children must come from the child support she receives from Father." Trial Ct. Order, 6/23/16, at 3; *accord* N.T., 5/23/16, at 15; Trial Ct. Op. at 6-7.

The trial court concluded that relocation will reduce the Children's relationships with family during their critical developmental years:

> If the relocation request is granted, the Children will lose the contact they have had with Father (at least until he stopped driving to the vicinity of Mother's residence to transport the Children). The only relative (other than Mother) that the Children would have in Dallas would be their maternal grandmother, who is moving there also to continue working for the same employer who employs Mother's husband (and which is moving its local operations completely to Dallas).

Trial Ct. Order, 6/23/16, at 3. This conclusion is not unreasonable based upon the evidence of record. *See D.K.*, 102 A.3d at 478.

**(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances**

**of the parties.** The trial court concluded, "There is no feasibility of preserving the relationship between Father and the Children through suitable custody arrangements," if relocation were allowed to proceed. Trial Ct. Order, 6/23/16, at 4. The trial court continued:

> Mother's husband adamantly testified that he would not be responsible for paying any costs associated with transporting the Children between Dallas and Lancaster. . . . Father's means are relatively modest and would not withstand the expenses of frequent travel between Dallas and Lancaster for the Children. For the time being, the Children are too young to travel unaccompanied by an adult.

*Id.*; **accord** N.T., 5/23/16, at 53. The trial court extrapolated on these themes in its well-reasoned opinion:

> The problem is that [Mother and Husband] wish to [relocate] at the expense of Father's relationship with the Children or, quite literally, at Father's sole monetary expense. Mother and Husband were content to enjoy the benefit of an income tax refund generated by Husband's claiming the Children as his dependents, and they planned to spend the refund on themselves. At the same time, Husband was unwilling to expend any funds to address Mother's transportation needs for the Children now or in the event that the relocation request had been granted. Frankly, the Court sees no equity in Mother and Husband's approach to meeting the Children's rights and needs to enjoy beneficial relationships with both Mother and Father, and the Court struggles with how ready Mother is to excise Father from the Children's lives. ***The ultimate and determinative factor in this case is that there presently is no feasible manner to preserve the relationship between Father and the Children if Mother is permitted to relocate to Texas with the Children.***

Trial Ct. Op. at 23-24 (emphasis added); **see** N.T., 5/23/16, at 53, 57-58, 64, 116, 170. Again, these conclusions are not unreasonable in light of the sustainable findings of the trial court. **See D.K.**, 102 A.3d at 478.

- 18 -

**(4) The child's preference, taking into consideration the age and maturity of the child.** The trial court pointed out that this factor is inapplicable, because the Children are too young to have a well-formed preference and were therefore not interviewed by the court. Trial Ct. Order, 6/23/16, at 4. The Parents agree. Mother's Brief at 30; Father's Brief at 10.

**(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.** The trial court found a pattern of conduct by Mother and Husband of attempting to undermine the relationship between Father and the Children. "While they are in Mother's physical custody, the Children are instructed to call [Husband] 'daddy' and to call Father [by his first name]." Trial Ct. Order, 6/23/16, at 5; *see* N.T., 5/23/16, at 32-33.[6] The trial court, observing Husband's testimony and other behavior first-hand, described Husband as "hostile toward Father." Trial Ct. Order, 6/23/16, at 10. The trial court added that Husband "refuses to make any reasonable

---

[6] Mother disputes the trial court's finding that "the [C]hildren were instructed to call Husband 'daddy' and to call Father [by his first name]," and she claims that there was "direct evidence to the contrary from Mother, Husband, and [M]aternal [G]randmother." Mother's Brief at 34. However, Mother does not cite to any specific notes of testimony or other portion of the record in support of her contention. Upon our review of the record, we observe that Mother and Maternal Grandmother affirmed that B.W.M. calls Father by his first name and not by "Daddy"; Mother also confirmed that she refers to Father by his first name when around B.W.M. N.T., 5/23/16, at 81, 97-98. During her testimony, Mother only disagreed that K.J.M. refers to Father by his first name. *Id.* at 97.

accommodation to enable the Children's relationship with Father to thrive."
Trial Ct. Order, 6/23/16, at 10; *accord* N.T., 5/23/16, at 57, 63-65.

**(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.** The trial court wrote:

> There is no evidence that the relocation will enhance the general quality of life for Mother. Rather, the relocation would at best preserve the present situation, and there might be some diminishment as Mother's household income will not increase but her household expenses may increase. The relocation is being requested because her husband's employer is closing operations at Spring Township, Berks County, and relocating these premises to Dallas, Texas. Mother does not work and indicated she will not work if the relocation is granted.

Trial Ct. Order, 6/23/16, at 5. Thus, the trial court considered this factor, and Mother acknowledged that relocation would not improve her quality of life. N.T., 5/23/16, at 107.

**(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.** The trial court discerned no enhancement of the quality of life for the Children, for reasons overlapping with those given with respect to the foregoing factors, such as eliminating the relationship between Father and the Children, due to the costs of transportation. Trial Ct. Order, 6/23/16, at 6. As the trial court summarized:

- 20 -

> [T]he only benefit which would result to anyone if this Court had granted Mother's relocation request would be Husband's retention of his employment position and salary. Since Husband strictly regulates who benefits from his income and to what extent, based upon his history and his express philosophy it is doubtful whether the Children would see any measurable benefit themselves.

Trial Ct. Op. at 28; *accord* N.T., 5/23/16, at 57; Trial Ct. Op. at 7. Moreover, Mother admitted that relocation would not improve the Children's quality of life. N.T., 5/23/16, at 107.

**(8) The reasons and motivation of each party for seeking or opposing the relocation.** Mother's sole reason for seeking relocation was for Husband's economic benefit. Husband testified that there was no possibility of maintaining his employment in Pennsylvania and that he is in a particularly remunerative position for someone with his educational credentials. N.T., 5/23/16, at 50. However, Husband was not qualified as an expert and provided no evidence of these claims, and the trial court doubted their accuracy. Trial Ct. Order, 6/23/16, at 6; Trial Ct. Op. at 27. With regard to issues of credibility and weight of the evidence, we must defer to the trial court, which viewed and assessed the witnesses, including Husband, first-hand. *See D.K.*, 102 A.3d at 478. The trial court also noted that Husband and Mother were obstinately refusing to consider any other options, such as Husband completing his college degree, Husband accepting employment in Pennsylvania for less salary, or Mother finding part-time employment. Trial Ct. Op. at 27.

Father opposed the relocation because the Children would become inaccessible to him. This motivation was unequivocal and understandable.

**(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.** According to the trial court and to the Parents' briefs, neither party made allegations of abuse. Trial Ct. Order, 6/23/16, at 7; Mother's Brief at 33; Father's Brief at 12. *See also* Mother's Criminal Record/Abuse History Certification, 5/3/16; Father's Criminal Record/Abuse History Certification, 5/6/16. There was no evidence presented about present or past abuse committed by any member of either of the Parents' households. *See* N.T., 6/8/16, at 198-99. The record is unclear as to the exact nature of Mother's two past referrals of Father to the Agency, but, as no action was taken by the Agency, these complaints appear to be unsubstantiated. N.T., 5/23/16, at 126. We therefore agree with the trial court that this factor is irrelevant to any decision as to relocation. Trial Ct. Order, 6/23/16, at 7.

**(10) Any other factor affecting the best interest of the child.**[7] The trial court did not identify any factor other than those discussed above

---

[7] This tenth relocation factor of 23 Pa.C.S. § 5337(h) concerns the best interest of the Children. As this factor corresponds to the fourth part of the second issue raised by Mother for our review on appeal, we do not need to address this issue separately. *See* Mother's Brief at 7 ¶ 2(D).

that is relevant to the best interests of the Children in the context of relocation. Mother did not demonstrate any other factors affecting the best interests of the Children; Mother's Brief merely reiterated the trial court's findings and then baldly claimed that "[t]he evidence did not support the Court's conclusion," without providing any further explanation. Mother's Brief at 33-34.

Our review of the record and the trial court's order and opinion convinces us that, contrary to Mother's contentions, the trial court did consider the ten factors set forth in 23 Pa.C.S. § 5337(h) when ruling on Mother's relocation request. The trial court's well-reasoned conclusions were based upon the evidence submitted at trial, as demonstrated by the trial court's copious citations to the record and as supported by our review.[8] We therefore find no abuse of discretion.[9]

---

[8] The second and third parts of the second issue raised by Mother on appeal are that the trial court's denial of Mother's relocation request "was based on findings that cannot be sustained under the evidence submitted at trial" and "was unreasonable in light of the facts submitted at trial." Mother's Brief at 7 ¶ 2(B)-(C). We have reviewed the record and disagree with Mother's arguments on this issue.

[9] Our conclusion on this issue disposes of the first part of the second issue raised by Mother on appeal. *See* Mother's Brief at 7 ¶ 2(A).

## Contempt

For her remaining issue, Mother contests the trial court's finding of contempt and its award of counsel fees as a sanction for the contempt. Mother's Brief at 7 ¶ 5 & at 34-37.

We review these issues to determine whether there was an abuse of discretion. ***Bowser v. Blom***, 807 A.2d 830, 834 (Pa. 2002); ***A.L.-S. v. B.S.***, 117 A.3d 352, 361 (Pa. Super. 2015); ***P.H.D. v. R.R.D.***, 56 A.3d 702, 706 (Pa. Super. 2012). An abuse of discretion is "[n]ot merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record." ***Bowser***, 807 A.2d at 834 (citations omitted).

According to 23 Pa.C.S. § 5323(g)(1)(v), "A party who willfully fails to comply with any custody order may . . . be adjudged in contempt. Contempt shall be punishable by . . . [c]ounsel fees and costs." In addition, Section 5339 provides, "a court may award reasonable interim or final counsel fees, costs and expenses to a party if the court finds that the conduct of another party was obdurate, vexatious, repetitive or in bad faith."[10]

_____

[10] Mother contends that Section 5339 is inapplicable, because "[t]hat section exists independent of the relocation section of the custody law." Mother's Brief at 37. But Mother was not held in contempt by the trial court for any
*(Footnote Continued Next Page)*

The trial court held Mother in contempt for failing to transport the Children to the designated custody exchange location in compliance with the trial court's order regarding physical custody transfers. Trial Ct. Order, 6/23/16, at 19; *see also* N.T., 5/23/16, at 9-10; Trial Cr. Op. at 18-19, 25-26. Further, the court found that Mother failed to make "any reasonable, ongoing effort to remedy her non-compliance with the Court's Order." Trial Ct. Order, 6/23/16, at 19; *see also* N.T., 5/23/16, at 37. The trial court considered Mother's declaration – in defiance of the court's order – that "Father must provide all transportation for Father to see the Children or Father will not see the Children at all" to be an "ultimatum." Trial Ct. Op. at 20; *accord* N.T., 5/23/15, at 37. The trial court was further "astounded" by Husband's "unwillingness" to help Mother in this regard. Trial Ct. Order, 6/23/16, at 19 n.2; N.T., 5/23/16, at 57, 64. The trial court took into account the impracticality of public transportation, the repeated breakdowns and ultimate sale of Mother's automobile, and the unavailability of regular transportation assistance from Mother's family and friends. Trial Ct. Order, 6/23/16, at 19 n.2; *see* N.T., 5/23/16, at 9, 57.

*(Footnote Continued)* ─────────────────

actions having to do with the relocation request; she was held in contempt for failing to adhere to terms of the existing custody order of September 30, 2016 relating to transfer of physical custody. Mother's argument therefore would be without merit even if her argument for limiting Section 5339's scope were correct. Moreover, Mother makes no argument against application of Section 5323(g)(1), and Section 5323(g)(1) itself is sufficient to support the trial court's order.

With this background, the trial court found Mother in contempt for her refusal to fulfill the terms of the agreed-upon custody order, including her reluctance "to reasonably compensate Father for his time and expenses associated with the additional transportation between the exchange point and Mother's residence" and to agree to "an extension of the time for Father's periods of physical custody of the Children to allow for the additional travel time." Trial Ct. Order, 6/23/16, at 19 n.2; *accord* Trial Ct. Op. at 26. As the trial court clearly articulated its reasons for finding Mother in contempt and demonstrated that Mother willfully failed to comply with the existing custody order while simultaneously never attempting to modify the order, we hold that the trial court did not abuse its discretion. Pursuant to 23 Pa.C.S. § 5323(1)(v), an award of counsel fees is therefore an appropriate sanction.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2016